Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the award, except for minor modifications, the Full Commission AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the deputy commissioner as:
 STIPULATIONS
1. Employee is Calvin A. Hyman.
2. Employer is Industrial Cryogenic Enterprises.
3. The carrier on the risk at the time of the alleged injury by accident was Selective Insurance Company.
4. Employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act. An employer-employee relationship existed between the employer and the employee on September 3, 1997, the alleged date of injury.
5. Plaintiff's claim is for an electrical shock, neck, back, right arm, right shoulder and head injury arising out of an accident in the scope and course of his employment, which defendants have denied.
6. The parties stipulated into evidence as Stipulated Exhibit 1, a packet of stipulated accident reports, Industrial Commission forms and plaintiff's medical records.
7. The parties stipulated that plaintiff's average weekly wage could be determined by an I.C. Form 22, Wage Chart, or a stipulation to the average weekly wage which the parties would provide following the hearing before the deputy commissioner. Neither a stipulation nor a Form 22 was filed.
 ***********
The Full Commission adopts the findings of fact found by the deputy commissioner and finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 44 years old. Plaintiff had been employed with defendant-employer intermittently for approximately one year. On September 3, 1997, plaintiff was employed with defendant-employer as a pressure washer, painter and cleaner. Plaintiff's supervisor indicated that plaintiff was a reliable employee and a good worker.
2. On September 3, 1997, plaintiff was working with defendant-employer at the Weyerhaeuser plant, stripping down the building. While the crew pressure washed the building, plaintiff was the ground man responsible for removing debris that was dislodged from the walls and ceilings from the concrete floor, removing water from the pressure washing from the concrete floor and carrying buckets of materials and supplies. Plaintiff was the only ground man for approximately seven workers performing the pressure washing. As part of his duties plaintiff cleaned water off the floor with a vacuum cleaner. As he bent down to pick up and move the power cable from the vacuum cleaner, plaintiff received an electrical shock. Upon receiving this shock plaintiff panicked, yelled and ran across the wet and dirty floor. Plaintiff fell on the floor, got up, ran again and fell a second time.
3. Plant paramedics were summoned and plaintiff was ultimately taken to the Washington County Hospital emergency room. At the hospital plaintiff was treated by Dr. Robert Venable, who obtained a history that plaintiff had received a 110 volt electrical shock to his right hand and arm and that he was in pain in those areas. Dr. Venable prescribed Toradol for pain and restricted plaintiff to light duty work until September 8, 1997.
4. There is some confusion relating to Dr. Venable's observation of a mass on plaintiff's right forehead and diagnosis of a hemotoma without asking plaintiff about the mass. However, plaintiff did not hit his head in the September 3, 1997 incident and the mass observed on plaintiff's forehead is a benign lipoma, which was pre-existing and unrelated to this claim.
5. Plaintiff was out of work on September 4, 1997 but returned to work on September 5, 1997 at the request of defendant-employer. Upon his return to work plaintiff indicated that he did not feel that he should be working while on pain medication. However, plaintiff's supervisor instructed him to perform light duty consisting of walking around and performing small tasks but no strenuous activities. Plaintiff was also allowed to sit in a chair if necessary. Plaintiff's supervisor, upon noticing that plaintiff was sitting and dozing off, allowed plaintiff to go home after working only a couple of hours.
6. After continuing to suffer from pain in his right arm and having a low energy level, on September 8, 1997 plaintiff presented to Dr. David C. Franklin. Prior to plaintiff's September 3, 1997 incident, plaintiff worked out regularly and ran approximately 100 miles per week. He did not have any prior neck or back problems. Dr. Franklin was of the impression that plaintiff suffered from post-electrical shock with mild myalgias. Plaintiff was switched from Toradol to Lortab and instructed to remain out of work for two days and to return if he did not improve.
7. Plaintiff returned to Dr. Franklin on September 10, 1997, indicating that he had passed out the night before when he attempted to stand from a sitting position. On this date, plaintiff complained of low back pain. Dr. Franklin ordered x-rays of plaintiff's left arm and low back and wrote him out of work for five days.
8. Plaintiff returned to work on September 15, 1997 and was instructed to perform light duty. Plaintiff was unable to perform light duty tasks and again sat in a chair and fell asleep. Plaintiff was instructed to go outside and sit in his supervisor's truck. When his supervisor returned to check on him, he found plaintiff lying in the front seat of the truck. Plaintiff explained that the medication he was taking made him sleepy, and he was sent home by his supervisor. Plaintiff returned to Dr. Franklin on September 19, 1997, complaining of continued severe low back pain and presenting with significant muscle spasms in the lumbosacral region of his low back. Plaintiff explained that he was having difficulty walking and sitting and could not jog at all. Dr. Franklin was of the opinion at that time that plaintiff suffered from a lumbosacral strain due to his fall at work, prescribed physical therapy and referred plaintiff to an orthopedic surgeon.
9. On September 22, 1997, after determining that plaintiff would probably be out of work for a significant period of time, defendant-employer reported plaintiff's incident to its workers' compensation carrier. On September 23, 1997, plaintiff gave written notice of his injury on a Form 18 specifically indicating that he injured his neck, back, shoulder and head.
10. Plaintiff began physical therapy on September 28, 1997 and returned to Dr. Franklin on October 3, 1997. On that date, Dr. Franklin observed plaintiff to be very depressed, walking with a limp on the right side and continuing to complain of back pain. Plaintiff was prescribed Zanax for anxiety and continued on Lortab. The original orthopedic appointment that plaintiff had been given was significantly in the future so Dr. Franklin scheduled plaintiff to see Dr. James Watson, a board-certified orthopedic surgeon, on October 8, 1997.
11. Plaintiff did not make his appointment with Dr. Watson due to a lack of money. However, on an October 20, 1997 visit to Dr. Franklin, plaintiff continued to complain of low back pain radiating into his right leg and right leg numbness. Plaintiff was rescheduled to see Dr. Watson where he presented on October 29, 1997. After taking a history and performing an examination on plaintiff, Dr. Watson was of the opinion that plaintiff had low back pain and leg symptoms probably from the fall, with a possible herniation of the nucleus pulposus or a ruptured disc. Dr. Watson ordered an MRI and continued plaintiff out of work.
12. On November 19, 1997, plaintiff's MRI results were reviewed revealing the presence of a herniated disc at L4-L5 on the right side. Dr. Watson was of the opinion that plaintiff should be restricted to no heavy lifting and no repetitive bending and offered treatment options of epidural steroid injections and surgery.
13. Plaintiff returned to Dr. Franklin on December 15, 1997, continuing to complain of pain. After reviewing the MRI results, Dr. Franklin referred plaintiff to Dr. Ira Hardy, a board-certified neurosurgeon, for a surgical versus conservative treatment determination.
14. Plaintiff presented to Dr. Hardy on December 22, 1997, at which time Dr. Hardy was of the impression that plaintiff had a L4-L5 disc protrusion and prescribed a course of physical therapy and instructed plaintiff to remain out of work.
15. Following physical therapy, plaintiff returned to Dr. Hardy on March 11, 1998, at which time he was using a cane. Plaintiff felt that the physical therapy had made his condition worse and also presented with a decreased sensation of pinprick on the right foot. A myelogram and post-myelogram CT scan revealed a bulging disc at L4-L5 with double density, suggesting the presence of a protrusion superimposed upon a bulge; however, it appeared that most of the bulge was intra-spinal.
16. On March 30, 1998, Dr. Hardy recommended that plaintiff undergo a right L4-L5 partial laminectomy. Plaintiff initially agreed to the recommended surgery, but when he returned on April 20, 1998, indicated that he wished to proceed with conservative treatment and was given a Medrol steroid dosepak.
17. The steroid dosepak was not successful and on May 11, 1998, plaintiff indicated to Dr. Hardy that he continued to have significant right leg pain. Again Dr. Hardy suggested surgery, but plaintiff opted to undergo a series of epidural steroid injections instead. These injections were also unsuccessful.
18. Plaintiff continued to receive conservative treatment. At an October 8, 1998 visit with Dr. Hardy, plaintiff was experiencing left leg numbness, and Dr. Hardy recommended a second myelogram.
19. The cervical MRI revealed a "swan neck" deformity associated with severe degenerative disc disease and mild stenosis in plaintiff's neck. The lumbar myelogram revealed that the L4-L5 region had worsened and supported plaintiff's bilateral lower extremity symptoms. Dr. Hardy was of the opinion that if plaintiff wanted to undergo surgery, he would need multi-level discketomies in his neck but that low back surgery would not improve plaintiff's symptoms and that all plaintiff could be offered for his low back was conservative management.
20. Plaintiff was last seen by Dr. Hardy on March 10, 1999, and an additional myelogram revealed significant stenosis from C4-T1 and a bulging disc a L4-L5. On June 6, 1999, Dr. Hardy assigned a 5% permanent partial impairment to plaintiff's back for his neck condition and a 5% permanent partial impairment rating to the low back. At that time, Dr. Hardy was also of the opinion that due to plaintiff's multi-level spinal cord deformity in the cervical spine, plaintiff would have substantial work limitations.
21. Following the September 3, 1997 incident, plaintiff has experienced feelings of guilt and worthlessness over the limitations imposed upon him by his physical condition and his inability to provide for his family. On June 23, 1999, plaintiff sought treatment at Tideland Mental Health Center. Plaintiff indicated to his counselor that he was a physically active person before his injury and that he could no longer do the things he used to do. He felt worthless and apprehensive about the likelihood that he would not recover and would remain in the same condition for the rest of his life. Plaintiff was diagnosed as having major depressive disorder and dysthymic disorder. Plaintiff continued to treat for his depression at Tideland through September 1999. Upon referral from Tideland, plaintiff underwent a neuropsychiatric evaluation with Dr. Manish Pozdar on November 5, 1999. Dr. Pozdar diagnosed plaintiff with chronic pain and depression without psychotic features. Dr. Pozdar recommended that plaintiff be placed on an antidepressant, continue counseling and undergo another course of physical therapy.
22. Dr. Hardy is of the opinion that plaintiff's fall which he sustained on September 3, 1997, caused his bulging disc at L4-L5 and the resulting lower back and lower extremity pain. Dr. Hardy was further of the opinion that plaintiff's cervical spine condition pre-existed his September 3, 1997 injury. Considering plaintiff's cervical degenerative disc disease, Dr. Hardy was of the opinion and the Commission finds that plaintiff's fall did not aggravate, activate or otherwise augment that condition. Dr. Hardy also stated that during the time he treated plaintiff, plaintiff was unable to work due to his low back condition.
23. Dr. Hardy was further of the opinion that on March 10, 1999, plaintiff's lower back pain would probably prevent him from doing any type of physical work, but that plaintiff could probably handle sedentary work and be able to ride in an automobile and to do those things limited primarily by discomfort. However, as far as plaintiff's neck condition is concerned, with the degree of stenosis that he has, Dr. Hardy was of the opinion that plaintiff should not do any work unless it could be done in his home, and should not drive.
24. Dr. Watson was unable to offer an opinion that plaintiff's herniated disc was caused by his fall and suspected that it was caused a degenerative process. However, Dr. Watson was also of the opinion that trauma could aggravate or activate a pre-existing degenerative disc process. The Commission gives greater weight to the causation testimony of Dr. Hardy than to that of Dr. Watson.
25. At the hearing before the Deputy Commissioner, plaintiff's version of the incident on September 3, 1997, was contradicted by the testimony of Joey Nelson, plaintiff's coworker. Mr. Nelson testified that plaintiff did not fall, but staggered to the center of the floor and collapsed or lowered himself to the ground. Deputy Commissioner Taylor found plaintiff's testimony concerning the events of September 3, 1997 to be more credible than the testimony of Mr. Nelson. The Full Commission declines to reverse the credibility determination of the Deputy Commissioner and finds plaintiff's version of the incident on September 3, 1997 credible.
26. On September 3, 1997, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer, to wit, an injury to his lumbar spine and right upper extremity and resulting major depression.
27. As a direct and proximate result of plaintiff's compensable September 3, 1997 injury, plaintiff was disabled and has been unable to earn the same wages he was earning at the time of his injury in the same or in any other employment from September 4, 1997 and continuing.
28. The treatment which plaintiff has received for his right upper extremity, lower back and depression was reasonably necessary to effect a cure and/or provide relief for plaintiff's symptoms.
29. There is a substantial risk that plaintiff will require future medical treatment for pain management of his lower back and for treatment of his major depression.
 ***********
Based upon the foregoing stipulations and findings of fact the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On September 3, 1997, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer, to wit, an injury to his lumbar spine and right upper extremity.
2. As a direct and proximate result of his compensable injury on September 3, 1997, plaintiff sustained an injury to his lower back, right upper extremity and major depression.
3. As a direct and proximate result of plaintiff's compensable September 3, 1997 injury, plaintiff was disabled and has been unable to earn the same wages he was earning at the time of his injury in the same or in any other employment from September 4, 1997 and continuing.
4. The treatment which plaintiff has received for his right upper extremity, lower back and depression was reasonably necessary to effect a cure and/or provide relief for plaintiff's symptoms.
5. There is a substantial risk that plaintiff will require future medical treatment for pain management of his lower back and for treatment of his major depression.
6. As defendants did not produce a Form 22 Wage Chart or a stipulation as to plaintiff's average weekly wage and as there is no evidence of record regarding plaintiff's average weekly wage, plaintiff's average weekly wage is determined to be $400.00 per week as based upon plaintiff's Form 18 and defendants' Form 19, both of which have been stipulated into evidence.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. For his temporary total disability, defendants shall pay compensation to plaintiff in the amount of $266.68 per week from September 3, 1997 and continuing until further Order of the Commission. Portions of this amount have accrued and shall be paid in a lump sum and all such amounts shall be subject to an attorney's fee as approved in Paragraph 2.
2. A reasonable attorney's fee in the amount of 25% of the compensation awarded in Paragraph 1 is hereby approved for plaintiff's counsel. The accrued portion of the fee shall be deducted from the accrued benefits and paid directly to plaintiff's counsel in lump sum. Thereafter, defendants shall forward every fourth check to plaintiff's counsel.
3. Defendants shall pay all medical compensation received by plaintiff to the extent necessary to effect a cure or give relief. Defendants shall pay all medical treatment received by plaintiff to this date for his right upper extremity, lumbar spine and major depression.
4. Defendants shall pay all future medical compensation to the extent necessary to effect a cure or give relief for plaintiff's lumbar spine and major depression.
5. Defendants shall pay the costs.
This the ___ day of October 2001.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/mhb